COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-161-CR
  
   
HENRY 
FRANKLIN MULLINS, JR.                                             APPELLANT
A/K/A 
HENRY FRANKLIN MULLINS
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
THE 372ND DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
I. Introduction
        A 
jury found appellant, Henry Franklin Mullins, Jr. a/k/a Henry Franklin Mullins 
(Mullins), guilty of (1) the manufacture of one to four grams of a controlled 
substance, namely methamphetamine, and (2) possession of a precursor to 
methamphetamine, namely pseudoephedrine, with the intent to manufacture 
methamphetamine. The trial judge then sentenced Mullins to forty years’ 
imprisonment for each conviction to run concurrently.  In five issues on appeal, Mullins 
challenges the legal and factual sufficiency of the evidence supporting his 
convictions and argues that the jury was improperly charged on the law of 
parties. We affirm.
II. Background Facts and Procedural History
        On 
December 27, 2002, there was an explosion and fire inside Apartment 9 at the 
Spring Oak Apartment complex located at 124 Roberts Cutoff in Fort Worth, 
Texas.  At the time of the fire, Apartment 9 was leased to Mullins.
        Lori 
Duncan, the manager of the apartment complex, testified that on the day of the 
fire she was getting an apartment ready for a tenant when she was approached by 
Mullins, who indicated that he was making a cake and needed to borrow a blender. 
She testified that although Mullins had requested a blender, she handed him a 
mixer because he had said he was making a cake. She stated that when she handed 
Mullins the mixer he said, “well, I guess that will work,” to which she 
replied, “well, you said you’re making a cake.”  The record then 
reflects that either Duncan or Mullins handed the mixer to a person accompanying 
Mullins, identified by Duncan as someone who occasionally stayed with Mullins 
and whom she knew as “Joe” or “Joe Don,” and that Joe Don took the mixer 
and left while Duncan and Mullins continued to talk.
        Duncan 
testified that she and Mullins were standing by the stairs when “all of a 
sudden we heard this loud noise, and he just got this look on his face.”  
Duncan stated that Mullins then ran into his apartment and returned to request a 
fire extinguisher.  Duncan testified that after she provided Mullins with a 
fire extinguisher, he went back into his apartment, and that is when he came 
back out and told her everything was okay, that the fire was out. When Duncan 
asked Mullins what happened, he stated, “it just caught on fire.”  
Duncan testified that when she told Mullins she was going to call the fire 
department he told her not to as the fire was already out.  She testified 
that she told Mullins she was going to call the fire department anyway.  
She stated that while she was waiting for the fire department, Mullins and Joe 
Don came out of the apartment, told her they were leaving to “get some stuff 
to fix the bathroom,” and left, leaving the door of the apartment open.
        After 
Mullins and Joe Don left, Duncan testified that she and another resident of the 
apartment complex, Gary Perkins, went inside Mullins’s apartment.  Duncan 
testified that while inside Mullins’s apartment she observed thick black 
smoke, a patch of burned carpet in the entryway leading to the bedroom, and a 
melted bathtub. She testified that the carpet was new and that the bathtub was 
not melted when she leased the apartment to Mullins in September of 2002. Duncan 
also testified that based upon information she received from Perkins, she and 
Perkins went inside Apartment 6, a vacant apartment, where she observed “some 
gas cans or whatever in the bathtub in the apartment.”
        Perkins 
testified that on December 27, 2002 he was a resident of the Spring Oaks 
Apartment complex and that on that date he “heard a bunch of commotion.” He 
testified that he observed smoke coming out of Apartment 9 and that he saw 
Mullins’s “roommate,” whom he indicated he knew as “Joe,” take a 
five-gallon can from the apartment to the dumpster. He also testified that he 
witnessed Mullins and Joe take “four more things out of the apartment” and 
put them into Apartment 6, which he believed to be vacant. He stated that he 
then saw both men leave in a pickup truck. Perkins testified that after Joe and 
Mullins left, he accompanied Duncan inside Mullins’s apartment where he 
observed that the carpet was “singed” and that the tub was “all black and 
melted.” Perkins also testified that on previous occasions he had noticed a 
“sulfur-type smell” coming from Mullins’s apartment.
        Officer 
John Gottlob of the Fort Worth Police Department testified that on December 27, 
2002 he executed a search warrant for Apartments 6 and 9 and that upon entering 
Apartment 9 he observed certain items that in his experience he had seen used in 
methamphetamine labs. He also testified regarding the procedure or process for 
manufacturing methamphetamine utilizing the Nazi or Birch reduction method, the 
ingredients being pseudoephedrine, lithium or sodium metal, anhydrous ammonia, 
and hydrochloride gas. He testified that pseudoephedrine can be extracted from 
cold tablets,[2] lithium metal can be taken from 
batteries, anhydrous ammonia can be made from fertilizer using a lye-water 
solution, and that hydrochloride gas can be made from salt and a sulfuric-acid 
based drain opener. He then identified several items seized by police at the 
scene and depicted in photographs offered by the State as exhibits. In 
particular, he testified that police seized, in Apartment 9, certain material 
found in the bathtub, a bottle labeled Red Devil Lye, a box labeled to contain 
salt, a bag labeled to contain fertilizer, a coffee filter containing a brownish 
tan residue, a measuring cup containing a white residue, a Ziploc bag containing 
a powdery substance[3] and a receipt for dry ice 
purchased at Southwest Carbonics. In addition, Officer Gottlob identified items 
seized by police and depicted in photographs from Apartment 6, including, among 
other things, two five-gallon gas cans found in the bathtub with what appears to 
be fire extinguisher material on top of them and burn marks on the sides, a 
plastic bag containing plastic buckets and some hoses and funnels, a bucket 
containing a length of coiled up hose and some liquid, three glass jars, a can 
of camp fuel,[4] and a glass jar containing liquid. 
Officer Gottlob also testified that police seized some peeled batteries, i.e., 
batteries without the metal casing, and mail addressed to Mullins at 124 Roberts 
Cutoff Road, Apartment 9.
        Max 
Courtney, a forensic chemist, testified that he collected samples and performed 
a chemical analysis on items found in Apartments 6 and 9, dusted all items found 
with printable surfaces for fingerprints, and dusted for fingerprints in 
Apartments 6 and 9. He testified that he obtained prints from a one gallon Crown 
camp fuel can and from three one-gallon glass jars. In addition, he testified 
that he found pseudoephedrine, some trapped ammonia, and a volatile hydrocarbon 
consistent with mineral spirits, which would be consistent with camp fuel, in 
the clumped material taken from near the drain of the bathtub of Apartment 9. 
Courtney testified that pseudoephedrine is an immediate precursor to 
methamphetamine and that this type of material was consistent with what is left 
over from the actual cooking of methamphetamine. He testified that he believed 
that the clump of material in the bathtub was the product of a 
“methamphetamine synthesis from pseudoephedrine via the Nazi method.” He 
also testified that he found both methamphetamine and pseudoephedrine in one of 
the glass jars, labeled by him as item number three. He described the material 
in the jar as being a “typical Nazi by-product.” In a jar labeled item 
number five, Courtney stated that he found a mixture of solvent or crystals and 
liquid. He stated that he stirred it up and took a sample and that that sample 
contained petroleum distillate, pseudoephedrine, and .06 percent methamphetamine 
by weight. He indicated that would equate to about .21 grams of methamphetamine 
in approximately one-half of the liquid present in the jar or .42 grams total. 
He testified that the coffee filter yielded .19 grams of material containing 
methamphetamine and pseudoephedrine. Courtney also testified that he found 2.4 
percent pseudoephedrine in a plastic bag of granular material weighing 171.21 
grams, opining that the material was the residue from the extraction of 
pseudoephedrine from between eight hundred to nine hundred cold tablets. 
Courtney testified that he found, in total, approximately 2.68 grams of 
methamphetamine.
        Finally, 
Courtney testified that he believed that Apartments 6 and 9 were the site of a 
clandestine methamphetamine lab and that methamphetamine was being produced 
utilizing the Birch-Bekenzer reduction reaction method, commonly referred to as 
the Nazi method. He testified that all the necessary ingredients to manufacture 
methamphetamine were found in Apartments 6 and 9 and that the remnants found in 
Apartments 6 and 9 were consistent with the manufacture of between four and two 
hundred grams of methamphetamine.
        Frank 
Shiller, testifying as a fingerprint expert, told the jury that he identified 
Mullins’s fingerprint on the glass jar labeled item number five and that he 
identified the fingerprint of Joe Don Hindman on the Crown camp fuel can.
        The 
court’s charge included a charge on the law of parties. Mullins did not object 
to the inclusion of the parties instruction in the charge.        
III. Sufficiency of the Evidence
        In 
his first four issues, Mullins attacks the legal and factual sufficiency of the 
evidence. In issues one and two, Mullins contends generally that the evidence is 
legally and factually insufficient to support his convictions. In his third 
issue, Mullins contends that the evidence is insufficient to support his 
conviction for the manufacture of methamphetamine because the State offered no 
evidence explaining “chemical synthesis” or proving that chemical synthesis 
was the method or manner used to manufacture methamphetamine in this case. In 
his fourth issue, Mullins contends that the evidence is legally and factually 
insufficient to support his convictions as a party because the State failed to 
prove the identity, and therefore the guilt, of Joe Don Hindman, the third party 
for whom the State alleged Mullins was criminally responsible.     
        The 
court’s charge authorized the jury to convict Mullins either as a principal or 
as a party to the manufacture of one to four grams of a controlled substance, 
namely methamphetamine, and of the possession of a precursor to methamphetamine, 
namely pseudoephedrine, with the intent to manufacture methamphetamine. See 
Tex. Health & Safety Code Ann. 
§ 481.112 (Vernon 2003), § 481.124 (Vernon Supp. 2004-05). The jury returned a 
general verdict finding Mullins guilty of both offenses. When, as here, the jury 
is authorized to convict on any one of several theories or methods of commission 
of the same crime and returns a general verdict of guilt, it does not matter 
that the evidence is insufficient to sustain one or more of the theories, so 
long as the evidence is sufficient to sustain the conviction under at least one 
theory. See Brooks v. State, 990 S.W.2d 278, 283 (Tex. Crim. App.), cert 
denied, 528 U.S. 956 (1999); Kitchens v. State, 823 S.W.2d 256, 258 
(Tex. Crim. App. 1991) (plurality op.), cert. denied, 504 U.S. 958 
(1992). Thus, we will first apply the legal and factual sufficiency standards of 
review to the evidence of Mullins’s guilt as a party to the offenses.
A. Legal Sufficiency—Standard of Review
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004).
        This 
standard gives full play to the responsibility of the trier of fact to resolve 
conflicts in the testimony, to weigh the evidence, and to draw reasonable 
inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319, 
99 S. Ct. at 2789. The trier of fact is the sole judge of the weight and 
credibility of the evidence. See 
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. 
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a 
legal sufficiency review, we may not re-evaluate the weight and credibility of 
the evidence and substitute our judgment for that of the fact finder. Dewberry 
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 
U.S. 1131 (2000). We must resolve any inconsistencies in the evidence in favor 
of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 
2000). The standard of review is the same for direct and circumstantial evidence 
cases. Burden v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner 
v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).
B. Factual Sufficiency—Standard of Review
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt. Id. at 484. There are two ways 
evidence may be factually insufficient: (1) the evidence supporting the verdict 
or judgment, considered by itself, is too weak to support the finding of guilt 
beyond a reasonable doubt; or (2) when there is evidence both supporting and 
contradicting the verdict or judgment, weighing all of the evidence, the 
contrary evidence is so strong that guilt cannot be proven beyond a reasonable 
doubt. Id. at 484-85. “This standard acknowledges that evidence of 
guilt can ‘preponderate’ in favor of conviction but still be insufficient to 
prove the elements of the crime beyond a reasonable doubt.” Id. at 485. 
In other words, evidence supporting a guilty finding can outweigh the contrary 
proof but still be insufficient to prove the elements of an offense beyond a 
reasonable doubt. Id.        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at 481; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder’s. Zuniga, 144 S.W.3d at 482.
        A 
proper factual sufficiency review requires an examination of all the evidence. Id. 
at 484, 486-87. An opinion addressing factual sufficiency must include a 
discussion of the most important and relevant evidence that supports the 
appellant’s complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 
(Tex. Crim. App. 2003).
C. Analysis
1. The Law of Parties
        Texas 
law provides that a person is criminally responsible as a party to an offense if 
the offense is committed by his own conduct, by the 
conduct of another for which he is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a) (Vernon 
2003). Moreover, a person is criminally responsible for an offense committed by 
the conduct of another if, acting with intent to promote or assist the 
commission of the offense, he solicits, encourages, directs, aids, or attempts 
to aid the other person to commit the offense. Id. § 7.02(a)(2).
        For 
a person to be guilty under the law of parties, the State must first prove the 
guilt of another as the primary actor. Richardson v. State, 879 S.W.2d 
874, 882 (Tex. Crim. App. 1993), cert. denied, 513 U.S. 1085 (1995). The 
State need not identify the primary actor to justify a jury charge on the law of 
parties; rather, it is sufficient that the State proves conduct by a third party 
constituting the offense and an act by the accused committed with the intent to 
promote or assist the conduct. See Perry v. State, 977 S.W.2d 847, 850 
(Tex. App.—Houston [14th Dist.] 1998, no pet.).
        In 
determining whether a defendant was a party, the trial court may look to events 
before, during, and after the commission of the crime. Goff v. State, 931 
S.W.2d 537, 545 (Tex. Crim. App. 1996), cert. denied, 520 U.S. 1171 
(1997). Mere presence at the scene of an 
offense is insufficient to establish liability as a party. Beardsley v. State, 
738 S.W.2d 681, 685 (Tex. Crim. App. 1987). However, a person’s presence at the scene of 
an offense is a “circumstance tending to prove guilt, which, combined with 
other facts, may suffice to show that the accused was a participant.” Id. 
Participation need not be proven by direct evidence; circumstantial evidence may 
be sufficient to show a person is a party to an offense. See id. at 684. The 
evidence must show that at the time of the offense, the parties were acting 
together, each contributing some part towards the execution of their common 
purpose. Burdine v. State, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986), cert. 
denied, 480 U.S. 940 (1987).
2. Application to the Facts
        Here, 
the court’s charge included an instruction on the law of parties. The application 
paragraph of the court’s charge relevant to the manufacturing charge 
instructed the jury as follows:
  
Now bearing in mind the foregoing instructions, if you believe from the 
evidence beyond a reasonable doubt that the defendant, Henry Franklin Mullins, 
Jr., on or about the 27th day of December 2002, in Tarrant County, Texas, did 
then and there intentionally or knowingly manufacture a controlled substance, 
namely methamphetamine of one gram or more but less than four grams, including 
any adulterants or dilutants, by producing, preparing or processing said 
controlled substance, independently by means of chemical synthesis; OR if you 
believe from the evidence beyond a reasonable doubt that Joe Don Hindman, on or 
about the 27th day of December, 2002, in Tarrant County, Texas, did then and 
there intentionally or knowingly manufacture a controlled substance, namely 
methamphetamine of one gram or more but less than four grams, including any 
adulterants or dilutants, by producing, preparing or processing said controlled 
substance, independently by means of chemical synthesis, and that Henry Franklin 
Mullins, Jr., acting with intent to promote or assist the commission of the 
offense, did encourage, aid or attempt to aid said Joe Don Hindman to commit 
said offense; then you will find the Defendant “Guilty” of the offense of 
manufacture of a controlled substance, namely methamphetamine of one gram or 
more but less than four grams, as charged in the first count of the indictment.

        A 
similar charge was given the jury on the offense of possession of a precursor to 
methamphetamine, namely pseudoephedrine, with intent to manufacture 
methamphetamine.
        With 
respect to the sufficiency of the evidence to support his convictions as a 
party, we interpret Mullins’s issues as challenging the sufficiency of the 
evidence to prove (1) the identity of Joe Don Hindman, (2) that the 
methamphetamine in this case was manufactured by chemical synthesis, and (3) 
that he, with the intent to promote or assist in the commission of the offenses, 
did encourage, aid, or attempt to aid Hindman to commit the offenses.
a. Identity of the Third Party
        We 
first address Mullins’s contention that there is insufficient evidence to 
support his convictions as a party because there is insufficient evidence 
establishing the identity, and therefore the guilt, of Joe Don Hindman. In 
support of his position, Mullins argues that the State failed to prove that 
Hindman, the party named in the jury instruction on the law of parties, was 
present at the apartments located at 124 Roberts Cutoff on the day of the fire. 
In that regard, Mullins points out that Duncan and Perkins testified regarding 
the acts of a person named “Joe” or “Joe Don” on the day of the fire but 
that neither identified the person they saw as “Joe Don Hindman.” Mullins 
acknowledges that fingerprint expert Frank Shiller testified that he found the 
fingerprint of Joe Don Hindman on a one-gallon fuel can seized by police at the 
scene, but argues that Schiller’s testimony alone is insufficient to prove 
that Hindman was present on the day of the fire. We disagree.
        Witness 
Perkins testified that on the day of the fire he observed smoke coming out of 
Apartment 9 and that he saw Mullins’s roommate, whom he knew as “Joe,” 
take a five-gallon can from Mullins’s apartment to the dumpster. A similar 
identification was made by apartment manager Duncan when she identified the 
person with Mullins that day as someone who occasionally stayed with Mullins and 
whom she knew as “Joe” or “Joe Don.” In addition, Officer Gottlob 
testified that police seized a camp fuel can at the scene after it had been 
recovered by a firefighter from the dumpster, and fingerprint expert Frank 
Schiller testified that he identified a fingerprint found on the camp fuel can 
to be that of Joe Don Hindman. Considered together, this is sufficient evidence 
from which a rational jury could have concluded that the third party identified 
in the charge as Joe Don Hindman was the party identified by the witnesses as 
“Joe” or “Joe Don.” Further, we believe that even if the name of the 
third party contained in the jury charge was technically incorrect, there was no 
error because based upon the testimony and evidence in this case, it would have 
been clear to the jury who the third party was. See Green 
v. State, 930 S.W.2d 655, 658 (Tex. App.—Fort Worth 
1996, pet. ref’d) (holding that the failure of the trial court to specifically 
name any other party in the application paragraph of the jury charge was not 
error because based on the testimony and argument, the jury was not confused as 
to who the parties were).
b. Sufficiency of the Evidence to Prove Manufacture by 
Chemical Synthesis
        The 
record reflects that Mullins was charged with and convicted of manufacturing 
methamphetamine by “chemical synthesis.” Section 
481.002 of the Texas Health and Safety Code defines “manufacture” as
the 
production, preparation, propagation, compounding, conversion, or processing of 
a controlled substance other than marihuana, directly or indirectly by 
extraction from substances of natural origin, independently by means of chemical 
synthesis, or by a combination of extraction and chemical synthesis, and 
includes the packaging or repackaging of the substance or labeling or relabeling 
of its container.
  
Tex. Health & Safety Code Ann. § 
481.002(25) (Vernon Supp. 2004-05). The 
Texas Health and Safety Code does not, however, define what constitutes chemical 
synthesis. See id. § 481.002.
        Mullins 
argues that the evidence is insufficient to support his conviction for the 
manufacture of methamphetamine because the State failed to explain chemical 
synthesis or prove that chemical synthesis was the method or manner used to 
manufacture methamphetamine in this case. 
However, Mullins fails to provide us with any authority to support his assertion 
that the State was required to define or otherwise explain the meaning of 
chemical synthesis, and we find no case standing for such a proposition.[5]  Further, we believe that there exists both legally 
and factually sufficient evidence in the record from which a rational jury could 
have concluded that the methamphetamine in this case was manufactured by 
chemical synthesis.
        At 
trial, Officer Gottlob testified in detail regarding the procedure and process 
for manufacturing methamphetamine using the Nazi or Birch reduction method. 
Courtney, the State’s chemist, testified that he performed a chemical analysis 
on various items seized by police from Apartments 6 and 9 and that, in total, he 
found approximately 2.68 grams of methamphetamine. He also testified that all 
the materials necessary to manufacture methamphetamine were found in Apartments 
6 and 9, that he believed that Apartments 6 and 9 were the site of a clandestine 
methamphetamine lab, that the methamphetamine was being produced utilizing the 
Birch-Bekenzer reduction method, commonly known as the Nazi method, and that the 
remnant materials found in the apartments were consistent with the manufacture 
of between four and two hundred grams of methamphetamine. He also testified that 
he believed that the clump of material found in the bathtub of Apartment 9 was 
the product of a “methamphetamine synthesis from pseudoephedrine via the Nazi 
method.” Finally, Courtney described the material found in one of the jars 
seized from the apartments as being a “typical Nazi by-product.” This is 
sufficient evidence from which a rational jury could have found that the 
methamphetamine seized by police at the scene was manufactured by chemical 
synthesis.
c. Evidence that Mullins Acted as a Party to the 
Offenses
        Finally, 
because we interpret Mullins’s challenge to the sufficiency of the evidence to 
include the allegation that there is insufficient evidence that he participated 
in the offenses as a party, we address whether there is legally and factually 
sufficient evidence to prove that Mullins, with the intent to promote or assist 
the commission of the offense, encouraged, aided or attempted to aid Joe Don 
Hindman in committing the offenses.
        Here, 
the record contains substantial evidence that Mullins was, if not a principal, a 
party to the offenses. The record reflects that Mullins was leasing the 
apartment where the fire took place and where police found not only remnants 
from the manufacture of methamphetamine, but methamphetamine and pseudoephedrine, 
a precursor to methamphetamine. The record also reflects that Mullins was living 
in Apartment 9 at the time of the fire, that he received his mail there, and 
that he was present at the time of the explosion and fire, albeit standing by 
the stairs outside the apartment talking to Duncan from whom he had just 
borrowed a mixer.[6]  The record further reflects 
that after the explosion Mullins ran inside the apartment, returned to ask 
Duncan for a fire extinguisher, and that he told Duncan not to call the fire 
department. In addition, there was testimony indicating that after Duncan told 
Mullins that she was going to call the fire department, Mullins and Hindman 
moved several items from inside Apartment 9 to Apartment 6, a vacant apartment. 
There was also evidence that Mullins and Hindman left the scene together before 
the fire department arrived, telling Duncan that they were going to “get some 
stuff to fix the bathroom.” Finally, the record reflects that Mullins’s 
fingerprint was found on a glass jar seized by police from Apartment 6 and that 
the jar contained methamphetamine. This is sufficient evidence from which a 
rational jury could have found that Mullins, at the very least, acted with the 
intent to promote or assist in the commission of the offenses by encouraging, 
aiding, or attempting to aid Joe Don Hindman in committing the offenses, i.e., 
that he was encouraging, aiding, or attempting to aid Hindman in the unlawful 
manufacture of methamphetamine, and in the possession of pseudoephedrine, with 
the intent to manufacture methamphetamine. See 
Goff, 931 S.W.2d at 545; Beardsley, 738 S.W.2d at 684-85; Burdine, 
719 S.W.2d at 315; see also East v. State, 722 S.W.2d 170, 171-72 (Tex. 
App.—Fort Worth 1986, pet. ref’d) (holding evidence sufficient to support 
conviction for manufacturing amphetamine when two defendants were present in a 
mobile home that contained a drug laboratory, defendants had custody and control 
of mobile home, the laboratory had been used by a third person to manufacture 
amphetamine, and odor associated with the manufacture of drugs was present at 
the time of the defendant’s arrests).
        Thus, 
applying the proper standards of review, we hold there to be legally and 
factually sufficient evidence to support Mullins’s convictions as a party. As 
such, we need not determine whether there is legally and factually sufficient 
evidence to support his convictions as a principal. See Brooks, 990 
S.W.2d at 283; Kitchens, 823 S.W.2d at 258. We overrule Mullins’s first 
four issues.
IV. Jury Charge
        In 
his fifth issue, Mullins contends that the trial court erred by including in the 
jury instructions an instruction on the law of parties. Specifically, Mullins 
contends that the trial court erred because there was insufficient evidence 
raising the issue of whether Mullins acted as a party to the charged offenses.
A. Standard of Review
        Appellate 
review of error in a jury charge involves a two-step process. Abdnor v. State, 
871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether 
error occurred. If so, we must then evaluate whether sufficient harm resulted 
from the error to require reversal. Id. at 731-32. Error preservation 
does not become an issue until harm is assessed because the degree of harm 
necessary depends on whether the defendant preserved error. Ngo v. State, 
No. PD-0504-04, 2005 WL 600353, at *3 (Tex. Crim. App. March 16, 2005); Middleton 
v. State, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).
B. Analysis
        A 
trial court must charge the jury fully and affirmatively on the law applicable 
to every issue raised by the evidence. Taylor v. State, 856 S.W.2d 459, 
470 (Tex. App.—Houston [1st Dist.] 1993), aff'd, 885 S.W.2d 154 (Tex. 
Crim. App. 1994); see Tex. Code Crim. Proc. Ann. art. 36.14 
(Vernon Supp. 2004-05); Jackson v. State, 633 S.W.2d 897, 899 (Tex. Crim. 
App. 1982). If evidence presented at trial raises an issue, and a jury charge is 
requested on that issue, then a charge on that issue must be given. Taylor, 856 
S.W.2d at 470. An instruction on the law of parties may be given when there is sufficient evidence to support a jury verdict 
that the defendant is criminally responsible under the law of parties. Ladd 
v. State, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999).
        Because 
we hold, in response to Mullins’s challenges to the sufficiency of the 
evidence, that there exists both legally and factually sufficient evidence in 
the record to support Mullins’s conviction as a party to the offenses, we hold 
that the trial court did not err by including an instruction in the jury charge 
on the law of parties. See Ladd, 3 S.W.3d at 564. We overrule Mullins’s 
fifth issue.
V. Conclusion

        Because 
we overrule Mullins’s five issues, we affirm the trial court’s judgment.


                                                          BOB 
MCCOY
                                                          JUSTICE


PANEL 
A:   CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

PUBLISH

DELIVERED: 
August 25, 2005

 
NOTES
1. 
See Tex. R. App. P. 47.4.
2. 
Officer Gottlob testified that the cold tablets are ground up to a powder and 
then alcohol or methanol is used to extract the pseudoephedrine. He stated that 
he has seen “food processors, coffee grinders and even hammers . . . used to 
mash them up.”
3. 
Officer Gottlob testified that the Ziploc bag containing the powdery substance 
was found inside a pair of mens extra-large coveralls. He indicated that he 
believed the coveralls belonged to Mullins based upon the size of the coveralls 
relative to the size of the two suspects in this case. He also testified that he 
found a photo ID of Mullins inside a pocket of the coveralls.
4. 
Officer Gottlob testified that the can of camp fuel found in Apartment 6 by 
police had been placed there by a firefighter who retrieved it from the 
dumpster.
5. 
In addition, we note that Mullins did not object to the jury charge or otherwise 
request that the trial court include a definition of chemical synthesis in the 
instructions given the jury.
6. 
As previously stated, the record reflects that Mullins attempted to borrow a 
blender from Duncan, but that instead Duncan loaned him a mixer because Mullins 
had said he was making a cake. The record also reflects that Hindman was with 
Mullins at the time Duncan gave him the mixer, that Hindman left with the mixer 
while Mullins and Duncan continued to talk, and that the explosion occurred 
while Mullins and Duncan were talking.